**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHELSEA ROYSE, derivatively on behalf of AGENUS INC., <br><br> Plaintiff, <br><br> vs. <br><br> GARO H. ARMEN, CHRISTINE M. KLASKIN, STEVEN J. O'DAY, BRIAN CORVESE, SUSAN HIRSCH, ALLISON M. JEYNES-ELLIS, ULF WIINBERG, and TIMOTHY R. WRIGHT, <br><br> Defendants, <br><br> and <br><br> AGENUS INC., <br><br> Nominal Defendant. | Case No.: 1:24-cv-12823 <br><br><br> **JURY TRIAL DEMANDED** |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Chelsea Royse ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Agenus Inc. ("Agenus" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Garo H. Armen ("Armen"), Christine M. Klaskin ("Klaskin"), Steven J. O'Day ("O'Day"), Brian Corvese ("Corvese"), Susan Hirsch ("Hirsch"), Allison M. Jeynes-Ellis ("Jeynes-Ellis"), Ulf Wiinberg ("Wiinberg"), and Timothy R. Wright ("Wright") (collectively, the "Individual Defendants," and together with Agenus, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Agenus, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and

1

against Defendants Armen, Klaskin, and O'Day for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Agenus, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Agenus's current and/or former directors and officers from January 23, 2023 through July 17, 2024, both dates inclusive (the "Relevant Period").

2.      Agenus is a Delaware-incorporated clinical-stage biotechnology company purportedly focused on developing therapies to activate the body's immune system against cancer and infections. The Company represents that its pipeline "includes immune-modulatory antibodies, adoptive cell therapies (via MiNK Therapeutics, Inc. ('MiNK')), and vaccine adjuvants (via SaponiQx, Inc. ('SaponiQx'))" and that its primary focus is immuno-oncology ("I-O"). With respect to its focus on I-O, the Company has represented the following:

> To succeed in I-O, innovation and speed are paramount. We are a vertically integrated biotechnology company equipped with a suite of technology platforms to advance from novel target identification through manufacturing for clinical trials of antibodies and cell therapies. By understanding each patient's cancer, we aim to substantially expand the population benefiting from current I-O therapies. In

addition to a diverse pipeline, we have assembled fully integrated end-to-end capabilities including novel target discovery, antibody generation, cell line development and cGMP manufacturing. Leveraging our science and capabilities, we have established strategic partnerships to advance innovation. We believe the next generation of cancer treatment will build on clinically validated antibodies targeting CTLA-4 and PD-1 combined with novel immunomodulatory agents designed to address underlying tumor escape mechanisms.

3.     The Company claims that its most advanced antibody candidates are: (1) botensilimab, a multifunctional immune cell activator and human Fc-enhanced cytotoxic T-lymphocyte antigen 4 (CTLA) blocking antibody, also known as AGEN1811, that has completed a Phase 2 clinical trial to treat second line cervical cancer; and (2) balstilimab, a programmed death receptor01 (PD-1) blocking antibody that is in a Phase 2 clinical trial for the treatment of pancreatic cancer and melanoma.

4.     The Company represents that it pursues clinical trials "designed to strengthen the efficacy and safety signals demonstrated to date and that may support a potential filing for full approval and/or accelerated approval based on the magnitude of benefit demonstrated" and, according to Agenus, its strategy "revolves around pioneering optimal combination treatments for cancer patients, with botensilimab as [its] cornerstone." The Company has largely focused on the development of the "botensilimab/balstilimab combination," Agenus's investigational therapy for the treatment of patients with metastatic colorectal cancer ("CRC").

5.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Agenus, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's botensilimab and balstilimab combination therapy was not as effective as Defendants had led investors to believe; and (2) due to the foregoing, the botensilimab and

balstilimab combination therapy's clinical results and regulatory and commercial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

6.      The truth fully emerged on July 18, 2024 when the Company published a press release announcing the results of an "end-of-Phase 2 (EOP2) meeting with the U.S. Food and Drug Administration (FDA), for the advancement of its immunotherapy combination, botensilimab (BOT) and balstilimab (BAL), for the treatment of adult patients with relapsed/refractory microsatellite stable colorectal cancer (r/r MSS CRC) with no active liver metastases (NLM)." The press release revealed that the "FDA advised against submission of these results in support of an Accelerated Approval based on their view that objective response rates may not translate to survival benefit."

7.      On this news, the Company's stock price fell $10.43 per share, or 58.83%, from a closing price of $17.73 on July 17, 2024 to close at a price of $7.30 per share on July 18, 2024.

8.      During the Relevant Period and as noted above, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

9.      In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Vice President ("VP") of Finance, and its Chief Medical Officer ("CMO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to

the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

10.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Armen's, Klaskin's, and O'Day's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

### Plaintiff

16.     Plaintiff is a current shareholder of Agenus. Plaintiff has continuously owned Agenus common stock since first purchasing the stock on December 28, 2018.

### Nominal Defendant Agenus

17.     Agenus is a Delaware corporation with its principal executive offices at 3 Forbes Road, Lexington, Massachusetts 02421. Agenus's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "AGEN."

### Defendant Armen

18.     Defendant Armen co-founded Agenus in 1994 and has served as the Company's CEO and Chairman since its founding and as a Company director since 1999. He also serves as a member of the Executive Committee. Defendant Armen previously served as the Company's President from its founding until December 2019. According to the Schedule 14A the Company filed with the SEC on April 26, 2024 (the "2024 Proxy Statement"), as of April 17, 2024, Defendant Armen beneficially owned 713,856 shares of the Company's common stock,

representing 3.3% of the class.[1] Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $5.40, Defendant Armen owned approximately $3.8 million worth of Agenus stock as of that date.[2]

19.     For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Armen received $5,856,319 in total compensation from the Company. This included $710,499 in salary, $625,000 in bonus, $312,500 in stock awards, and $4,208,320 in option awards.

20.     The 2024 Proxy Statement stated the following about Defendant Armen:

> Dr. Armen is Chairman and Chief Executive Officer of Agenus Inc., which he co-founded in 1994. Dr. Armen brings to our Board a deep historical and practical knowledge of the business of the Company and its technologies, as well as years of expertise in the financial and biopharmaceutical arenas. From mid-2002 through 2004, he was Chairman of the Board of Directors for the biopharmaceutical company Elan Corporation, plc which he helped restructure. Dr. Armen currently serves as executive Chairman of the Board of Directors of Protagenic Therapeutics, Inc., a publicly held biotechnology company and as the Chairman of the Board of MiNK Therapeutics, Inc., a publicly traded affiliate of Agenus.
>
> Dr. Armen is also the founder and Chairman of the Children of Armenia Fund, a philanthropic organization established in 2000 that is dedicated to the positive development of the children and youth of rural Armenia. He holds a Ph.D. degree in physical organic chemistry from the City University of New York.

**Defendant Klaskin**

---

[1] Page 45 of the 2024 Proxy Statement states: "In accordance with SEC rules, we have included in the column 'Number of Issued Shares' all shares of common stock over which the person has sole or shared voting or investment power as of April 17, 2024, and we have included in the column 'Number of Shares Issuable' all shares of common stock that the person has the right to acquire within 60 days after April 17, 2024 through the exercise of any stock options, the vesting of restricted shares, or in the case of directors, any shares to be distributed under the DDCP. All shares that a person has a right to acquire within 60 days of April 17, 2024 are deemed outstanding for the purpose of computing the percentage beneficially owned by the person, but are not deemed outstanding for the purpose of computing the percentage beneficially owned by any other person."

[2] Plaintiff's calculations of the worth of each Individual Defendant's Agenus stock holdings discussed herein are based on the sum of that Individual Defendant's holdings of Number of Issued Shares and Number of Shares Issuable (*i.e.*, the amount in the "Total" column under the "Ownership of Our Common Stock" section in the 2024 Proxy Statement), multiplied by $5.40 (*i.e.*, the price per share of Agenus's common stock at the close of trading on April 17, 2024).

21.     Defendant Klaskin has served as the Company's VP of Finance since October 2006. According to the 2024 Proxy Statement, as of April 17, 2024, Defendant Klaskin beneficially owned 40,360 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $5.40, Defendant Klaskin owned approximately $217,944 worth of Agenus stock as of that date.

22.     For the 2023 Fiscal Year, Defendant Klaskin received $712,747 in total compensation from the Company. This included $296,239 in salary, $104,378 in bonus, $43,013 in stock awards, $262,295 in option awards, and $6,822 in all other compensation.

23.     The 2024 Proxy Statement stated the following about Defendant Klaskin:

***Christine M. Klaskin***—Vice President of Finance—Ms. Klaskin, 58, has been our Vice President, Finance since October 2006. Since joining Agenus Inc. in 1996 as finance manager, Ms. Klaskin has held various positions within the finance department and has been involved in all equity and debt offerings of the Company including its IPO. Additionally, Ms. Klaskin serves as the Treasurer of MiNK Therapeutics, Inc. Prior to joining Agenus, Ms. Klaskin was employed by Arthur Andersen as an audit manager. Ms. Klaskin received her Bachelor of Accountancy from The George Washington University.

**Defendant O'Day**

24.     Defendant O'Day has served as the Company's CMO since January 2021. According to the 2024 Proxy Statement, as of April 17, 2024, Defendant O'Day beneficially owned 38,372 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $5.40, Defendant O'Day owned approximately $207,209 worth of Agenus stock as of that date.

25.     For the 2023 Fiscal Year, Defendant O'Day received $1,435,980 in total compensation from the Company. This included $590,480 in salary, $371,800 in bonus, $143,000 in stock awards, $322,000 in option awards, and $8,700 in all other compensation.

26.     The 2024 Proxy Statement stated the following about Defendant O'Day:

**Steven O'Day, MD**—Chief Medical Officer—Dr. O'Day, 63, has been our Chief Medical Officer since January 2021. Dr. O'Day is a pioneer in CTLA-4 inhibition, and has been the principal investigator in more than 200 clinical trials. From 2015 until joining Agenus, was Director of Immuno-Oncology and Director of Clinical Research at John Wayne Cancer Institute at Providence Saint John's Health Center. Dr. O'Day received his medical degree in 1988 from Johns Hopkins School of Medicine and his BA in Chemistry from Williams College in 1983. Additionally, Dr. O'Day did his medical oncology fellowship at the Dana Farber/Harvard Cancer Center.

### Defendant Corvese

27.   Defendant Corvese has served as a Company director since 2007 and also serves as Chair of the Executive Committee and as a member of the Compensation Committee and Corporate Governance and Nominating Committee. According to the 2024 Proxy Statement, as of April 17, 2024, Defendant Corvese beneficially owned 49,249 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $5.40, Defendant Corvese owned approximately $265,945 worth of Agenus stock as of that date.

28.   For the 2023 Fiscal Year, Defendant Corvese received $888,141 in total compensation from the Company. This included $142,500 in fees earned or paid in cash, $554,141 in option awards, $71,500 in stock awards, and $120,000 in other compensation.

29.   The 2024 Proxy Statement stated the following about Defendant Corvese:

Since 1999, Mr. Corvese has been the President and Founder of Vencor Capital ("Vencor"), a private equity firm with telecommunications and technology investments in the Middle East and Mediterranean regions. Prior to working at Vencor, Mr. Corvese worked on investments in the U.S. and global equity markets as a Managing Director and partner at Soros Fund Management, the largest hedge fund in the world at the time. From 1988 to 1996, Mr. Corvese was a partner at Chancellor Capital Management ("Chancellor"), a $25 billion money management firm. While at Chancellor, Mr. Corvese was a Portfolio Manager with responsibility for investments made in basic industries, restructurings, and special situations, corporate governance investments, as well as founded and managed his own hedge fund. From 1981 to 1988, Mr. Corvese was with Drexel Burnham Lambert ("Drexel") as an equity analyst following the chemical and specialty chemical

industries and participated in a significant number of merger and acquisition activities. While at Drexel, Mr. Corvese was a member of the top chemical and specialty chemical research team, as ranked by Institutional Investor. Mr. Corvese currently serves on the Board of Directors of MiNK Therapeutics, Inc., the National Telecommunications Corporation, based in Cairo, Egypt, and Protagenic Therapeutics, an affiliate of Agenus, based in Ontario, Canada. Mr. Corvese earned degrees in finance and political science from The University of Rhode Island and attended New York University Graduate School. With over 30 years of experience in the financial industry, Mr. Corvese brings substantial financial, business and governance expertise to our Board.

**Defendant Hirsch**

30.     Defendant Hirsch has served as a Company director since October 2020 and also serves as a member of the Audit and Finance Committee (the "Audit Committee"). According to the 2024 Proxy Statement, as of April 17, 2024, Defendant Hirsch beneficially owned 30,725 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $5.40, Defendant Hirsch owned approximately $165,915 worth of Agenus stock as of that date.

31.     For the 2023 Fiscal Year, Defendant Hirsch received $242,000 in total compensation from the Company. This included $85,000 in fees earned or paid in cash and $157,000 in option awards.

32.     The 2024 Proxy Statement stated the following about Defendant Hirsch:

Ms. Hirsch has over 40 years of experience in investment management and finance. Until February 2021, she was a Managing Director and Portfolio Manager at Nuveen, a TIAA company, where she was responsible for managing over $20 billion in assets including the TIAA-CREF Large-Cap Growth Fund with $6.6 billion in assets. Prior to joining Nuveen in 2005, she served as Executive Vice President and Portfolio Manager for the Mid-Cap Growth and Technology Sector portfolios as Jennison Associates. Ms. Hirsch's previous experience also includes investment management positions at Lehman Brothers Global Asset Management and Delphi Asset Management as a Senior Portfolio Manager for the Selected Growth Stock Portfolio. She began her career as an analyst at Smith Barney and Lehman Brothers where the success of her quantitative model led to her subsequent recognition as a top ranked Institutional analyst for small cap growth stocks in 1991, 1992 and 1993. Ms. Hirsch holds a BS in Accounting from Brooklyn College.

10

Ms. Hirsch qualifies as an audit committee financial expert and brings extensive investment and financial experience to our Board.

**Defendant Jeynes-Ellis**

33.     Defendant Jeynes-Ellis served as a Company director from 2016 until she resigned in June 2024. Prior to her resignation, she served as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 17, 2024, Defendant Jeynes-Ellis beneficially owned 28,308 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $5.40, Defendant Jeynes-Ellis owned approximately $152,863 worth of Agenus stock as of that date.

34.     For the 2023 Fiscal Year, Defendant Jeynes-Ellis received $242,000 in total compensation from the Company. This included $85,000 in fees earned or paid in cash and $157,000 in option awards.

35.     The Schedule 14A the Company filed with the SEC on April 28, 2023 (the "2023 Proxy Statement") stated the following about Defendant Jeynes-Ellis:

> Dr. Jeynes-Ellis is a trained clinician with more than 25 years of senior leadership experience in the pharmaceutical industry. Dr. Jeynes-Ellis has been the Chief Executive Officer of Avillion LLP ("Avillion"), a London-based drug development company since 2014. Prior to her current position as CEO, Dr. Jeynes-Ellis served as Avillion's Chief Medical Officer from December 2012 to January 2014. Before her tenure at Avillion, Dr. Jeynes-Ellis worked in senior roles at Wyeth, Bristol-Myers Squibb, and Novartis. Her previous affiliations also include Cambridge Antibody Technology and Genentech, government bodies and medical charities. She has managed teams focusing on global clinical development projects that have led to drug approvals in Europe and the United States, across a range of therapeutic areas. Dr. Jeynes-Ellis became the Chair of the Board of OxSonics Therapeutics ("OxSonics") in April 2021. OxSonics is a biotechnology company developing ultrasound-based drug delivery systems for the treatment of cancer. Dr. Jeynes-Ellis also sits on the Board of Directors of Anaveon and is a Senior Advisor to Blackstone Life Sciences and a Special Advisor to Abingworth. Dr. Jeynes-Ellis bring to our Board substantial experience as a life science executive and medical expertise.

**Defendant Wiinberg**

36.     Defendant Wiinberg served as a Company director from 2016 until he resigned on October 30, 2024. Prior to his resignation, he served as Chair of the Audit Committee and as a member of the Corporate Governance and Nominating Committee. According to the 2024 Proxy Statement, as of April 17, 2024, Defendant Wiinberg beneficially owned 52,284 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $5.40, Defendant Wiinberg owned approximately $282,334 worth of Agenus stock as of that date.

37.     For the 2023 Fiscal Year, Defendant Wiinberg received $366,385 in total compensation from the Company. This included $102,500 in fees earned or paid in cash and $206,885 in option awards.

38.     The 2024 Proxy Statement stated the following about Defendant Wiinberg:

Mr. Wiinberg has almost 20 years of senior leadership experience. Mr. Wiinberg previously served as Chief Executive Officer of H. Lundbeck A/S ("Lundbeck") from June 2008 to December 2014. Lundbeck is a global pharmaceutical company developing and marketing treatments for psychiatric and neurological disorders. He previously served on the boards of several health care industry associations and held multiple executive roles at Wyeth, one of the world's largest research- driven pharmaceutical companies that was acquired by Pfizer in 2009. He served as President of Wyeth Europe, Africa and Middle East; President of Consumer Healthcare; Managing Director of Wyeth UK, and in various commercial positions. Mr. Wiinberg currently serves on the boards of UCB SA, a global biopharmaceutical company based in Belgium, Hansa Medical AB (Chairman), a Swedish biopharmaceutical company, Alfa Laval AB, a Swedish industrial company, and MiNK Therapeutics, Inc., an affiliate of Agenus. Mr. Wiinberg qualifies as an audit committee financial expert and brings to our Board years of experience in the biotechnology, pharmaceutical and healthcare industries internationally as well as extensive financial and corporate governance experience.

**Defendant Wright**

39.     Defendant Wright has served as a Company director since 2006 and also serves as Chair of Corporate Governance and Nominating Committee and as a member of the Executive Committee, Compensation Committee, and Audit Committee. According to the 2024 Proxy

Statement, as of April 17, 2024, Defendant Wright beneficially owned 50,582 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 17, 2024 was $5.40, Defendant Wright owned approximately $273,143 worth of Agenus stock as of that date.

40.     For the 2023 Fiscal Year, Defendant Wright received $385,500 in total compensation from the Company. This included $150,000 in fees earned or paid in cash and $235,500 in option awards.

41.     The 2024 Proxy Statement stated the following about Defendant Wright:

Mr. Wright is the former CEO of MiMedx Group, a placental biological company focused in regenerative medicine. Mr Wright served as CEO and a member of the Board of Directors of MiMedx from May 2019 to September 2022. Mr. Wright has also served as a Founding Partner of Signal Hill Advisors, LLC since February 2011. Mr. Wright also served as chairman of The Ohio State University Comprehensive Cancer Center Drug Development Institute that he founded in 2011, and director of the Ohio State University Innovation Foundation until September 2022. Mr. Wright was the President and Chief Executive Officer and a director of M2Gen Corp., a privately held Cancer health informatics company, between July 2017 and September 2018.  From April 2015 through July 2017, Mr. Wright was the Executive Vice President, Mergers and Acquisitions, Strategy and Innovation at Teva Pharmaceuticals Industries Ltd. Mr Wright has held several global executive roles throughout his career including President of Covidien Mallinkrodt, a medical imaging and pharmaceutical company (a subsidiary of Covidien, now Medtronic) from 2007-2010.

Mr. Wright brings to our Board over 30 years of global pharmaceutical industry experience in general management, product development, and commercialization as well as business restructuring and transaction experience. Beginning in April 2004, Mr. Wright was interim CEO, President and a member of the Board of Directors of AAI Pharma, a hybrid pharmaceutical, drug delivery/manufacturing, and global clinical research organization. Upon the sale of AAI Pharma's pharmaceutical assets to Xanodyne Pharmaceuticals Inc., Mr. Wright transitioned to Chief Operating Officer at Xanodyne Pharmaceuticals Inc., a role he maintained until May 2006. Mr. Wright was also President of Elan Bio-Pharmaceuticals and has held several senior management positions with Cardinal Health Inc. and Dupont Merck Pharmaceutical Company. Over his career, Mr. Wright has served on ten Boards of Directors, including six in North America and four in Europe and Asia. Mr. Wright serves on the boards of Washington University Medical School and North Carolina State School of Veterinary Medicine. Mr. Wright earned his

bachelor's degree from The Ohio State University. Mr. Wright's global and extensive biotechnology, pharmaceuticals and life sciences operating experience combined with his professional Board experience brings important insight to Agenus.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42.     By reason of their positions as officers and/or directors of Agenus and because of their ability to control the business and corporate affairs of Agenus, the Individual Defendants owed Agenus and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Agenus in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Agenus and its shareholders so as to benefit all shareholders equally.

43.     Each director and officer of the Company owes to Agenus and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Agenus, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

45.     To discharge their duties, the officers and directors of Agenus were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Agenus, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Agenus's Board at all relevant times.

47.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

48.     To discharge their duties, the officers and directors of Agenus were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Agenus were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United

States, and pursuant to Agenus's own Code of Business Conduct and Ethics ("Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Agenus conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Agenus and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Agenus's operations would comply with all applicable laws and Agenus's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49.     Each of the Individual Defendants further owed to Agenus and the shareholders the duty of loyalty requiring that each favor Agenus's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

50.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Agenus and were at all times acting within the course and scope of such agency.

51.     Because of their advisory, executive, managerial, and directorial positions with Agenus, each of the Individual Defendants had access to adverse, non-public information about the Company.

52.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Agenus.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

53.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

54.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations

of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

55.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Agenus was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

56.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

57.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Agenus and was at all times acting within the course and scope of such agency.

## **AGENUS'S CODE OF CONDUCT**

58.     The Company's Code of Conduct represents that it "applies to Agenus Inc. and its subsidiaries globally" and purportedly "provides a means for setting standards, identifying

concerns, and addressing them early so that Agenus is best able to meet its ethical and legal

expectations and responsibilities."

59.     In a section titled "Compliance with Laws, Rules, and Regulations," the Code of

Conduct states the following, in relevant part:

> Agenus will comply with all laws, rules and regulations that are applicable to
> Agenus's activities; all Covered Persons are required to do the same when acting
> on behalf of Agenus. Specifically, Agenus is committed to: • maintaining a safe
> and healthy work environment; • promoting a workplace that is free from
> discrimination or harassment based on race, color, religion, national origin, gender,
> gender identity, sexual orientation or other factors that are protected by applicable
> laws or are unrelated to Agenus's business interests; • conducting its relationships
> with health care professionals, patients, clinical trial subjects, clinical trial sites,
> investigators and customers to ensure compliance with applicable health care
> statutory and regulatory requirements; • supporting fair competition and laws
> prohibiting restraints of trade and other unfair trade practices; • keeping the
> political activities of Agenus's Covered Persons separate from Agenus's business;
> and • complying with all applicable state and federal securities laws

60.     In a section titled "Insider Trading Compliance," the Code of Conduct states:

> In addition, Covered Persons are prohibited, by law, from buying or selling
> Agenus's securities while in possession of material, nonpublic ("inside")
> information about Agenus, or disclosing any such inside information to a third party
> (i.e., tipping). Agenus's Securities Trading Policy, 2 as amended from time to time,
> which describes the nature of inside information and the related restrictions on
> trading, is incorporated into this Code by reference. Covered Persons are expected
> to comply with all Agenus's policies related to insider trading.

61.     In a section titled "Conflicts of Interest," the Code of Conduct states the following,

in relevant part:

> Covered Persons may not engage in any activity that creates, or gives the
> appearance of, a conflict of interest, without obtaining necessary approval in
> advance. A "conflict of interest" occurs when the personal interest of a Covered
> Person interferes with Agenus's interests. Conflicts of interest may arise in many
> situations. For example, conflicts of interest can arise when an Agenus Covered
> Person takes an action or has an outside interest, responsibility or obligation that
> may make it difficult for him or her to perform the responsibilities of his or her
> position objectively and/or effectively in Agenus's best interests. This can occur if
> Agenus enters into a business transaction with a party and a Covered Person has an
> existing relationship with that party. Conflicts of interest may also occur when an

Agenus Covered Person, or his or her Immediate Family Member (as defined below), receives a personal benefit (whether improper or not) as a result of the Covered Person's position with Agenus or outside business interest.

62. In a section titled "Confidentiality; Protection and Proper Use of Agenus's Assets,"

the Code of Conduct states the following, in relevant part:

> Confidentiality Covered Persons shall maintain the confidentiality of all information entrusted to them by Agenus or its suppliers, customers or other business partners, except when disclosure is authorized by Agenus or legally required, as determined by the Agenus Legal department. Confidential information includes (1) information marked "Confidential," "Private," "For Internal Use Only," or similar legends, (2) technical or scientific information relating to current and future products, services or research, regulatory plans, (3) business or marketing plans or projections, (4) earnings and other internal financial data, (5) personnel information, (6) supply and customer lists and (7) other non-public information that, if disclosed, might be of use to Agenus's competitors, or harmful to Agenus's employees or its suppliers, customers or other business partners. The review and approval of the Chief Legal Officer or his/her designee is required prior to publications, public presentations, disclosures of trade secrets, and/or proprietary information to ensure patent rights and trade secret as well as other confidential information is protected. To avoid inadvertent disclosure of confidential information, Covered Persons shall not discuss confidential information with or in the presence of any unauthorized persons, including family members and friends.

63. In a section titled "Health Regulatory Compliance," the Code of Conduct states:

> As a biopharmaceutical company, Agenus is subject to the U.S. Federal, Food, Drug, and Cosmetic Act and its associated Food and Drug Administration ("FDA") regulations, and similar state, federal, and international laws and regulations that govern the testing, manufacture, sale, pricing, reimbursement, and promotion of our products. These laws and regulations are designed to assure the safety, efficacy, and quality of our products, to assure the protection of human subjects in clinical trials and their privacy, to respect animal welfare in the course of our research activities, and to help assure the independence and validity of our clinical research. Agenus expects its Covered Persons to become familiar with all applicable Agenus policies and procedures that assure compliance with these laws and regulations, and that all managers ensure that their employees are trained on such policies and procedures applicable to such employees' areas of responsibility. Violations of these laws and regulations can involve serious civil and criminal penalties for Agenus and Covered Persons individually. Early identification and resolution of concerns can substantially mitigate any risk of harm to patients and help prevent violations on the part of Agenus. Agenus supports and complies with standards established by industry and professional groups that concern industry relationships with medical professionals and sponsorship of medical education and scientific

symposia. In the United States, these standards include the American Medical Association (AMA) Guidelines on Gifts to Physicians from Industry, and the Accreditation Council for Continuing Medical Education (ACCME) Guidelines for Commercial Support of Continuing Medical Education, as well as the PhRMA Code                [https://phrma.org/en/resource-center/Topics/STEM/Code-on-Interactionswith-Health-Care-Professionals]. There are similar organizations and governing standards such as the Association of British Pharmaceutical Industry (ABPI) in the United Kingdom and European Federation of Pharmaceutical Industries and Associations (EFPIA) in the EU which set relevant standards for how we conduct our activities in those regions. Please familiarize yourselves with the applicable standards if you participate in the planning or conduct of these types of activities.

64.     In a section titled "Maintenance of Corporate Books, Records, Documents, and Accounts; Accurate and Timely Public Disclosure," the Code of Conduct states the following, in relevant part:

Agenus is committed to providing investors with full, fair, accurate, timely and understandable disclosure in the reports that it is required to file and in its other public communications. To this end, Agenus shall: • comply with generally accepted accounting principles at all times; • maintain a system of internal accounting controls that Covered Persons comply with and where all transactions are properly recorded and supported by appropriate documentation; • maintain books and records that accurately and fairly reflect Agenus's transactions, where Covered Persons have not made entries that intentionally hide or disguise the nature of any transaction or of any of our liabilities or that misclassify any transactions as to accounts or accounting periods; • prohibit the establishment of any material undisclosed or unrecorded funds or assets, ensuring that no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; • cooperate fully with our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; • not knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects; • maintain a system of internal controls that will provide reasonable assurances to management that material information about Agenus is made known to management, particularly during the periods in which Agenus's periodic reports are being prepared; and • present information in a clear and orderly manner and avoid the use of unnecessary legal and financial jargon in Agenus's reports and public communications. Any Covered Person who becomes aware of any suspected departure from these standards has a responsibility to report his or

her knowledge promptly to the Chief Legal Officer or Chief Compliance Officer or Vice President, Finance.

65.     In a section titled "Administration of Code, Reporting Mechanisms, and Enforcement," the Code of Conduct states the following, in relevant part:

> Agenus's Chief Legal Officer or Chief Compliance Officer (in consultation with the CGNC), is responsible for setting the standards of business conduct contained in this Code and updating these standards as appropriate from time to time to reflect changes in the legal and regulatory framework applicable to Agenus, the business practices within Agenus's industry, Agenus's own business practices, and the prevailing ethical standards of the communities in which Agenus operates. This Code forms the foundation for Agenus's corporate compliance program. Agenus's Chief Legal Officer or Chief Compliance Officer will administer the procedures designed to implement this Code to ensure that they are operating effectively. The Chief Legal Officer or Chief Compliance Officer will report periodically to the CGNC or the A&F Committee (as applicable), on any reports of violations, investigations undertaken, and any corrective action plans or disciplinary measures taken. Covered Persons shall promptly report, in person, via telephone, or in writing (electronic or otherwise), any known or suspected violation of laws, rules, regulations, this Code or any other Agenus policy or procedure to the Chief Legal Officer or Chief Compliance Officer, or to another member of senior management. In reporting any concerns, you may choose to remain anonymous. We have established an anonymous reporting line (listed below) that is available for Covered Persons to seek guidance or report concerns regarding business-related conduct or compliance concerns. If you leave a message, the system will not record your telephone extension and will preserve your anonymity.
>
> • The compliance reporting line is: 855-446-0303. Alternatively, you may also report misconduct at agenusbio.ethicspoint.com or via email to: compliance@agenusbio.com.

66.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the

accuracy of Company records and reports, comply with laws and regulations, conduct business in

an honest and ethical manner, and properly report violations of the Code of Conduct and law.

## AGENUS'S AUDIT COMMITTEE CHARTER

67.    The Company's Audit and Finance Committee Charter (the "Audit Committee

Charter") states the following regarding the purpose of the Audit Committee:

> The principal purpose of the Audit and Finance Committee (the "Committee") is to assist the Board of Directors (the "Board") of Agenus Inc. (the "Company") in fulfilling its responsibility to oversee the Company's accounting and financial reporting processes and audits of the Company's financial statements and internal controls over financial reporting, including by reviewing the financial reports and other financial information provided by the Company, the Company's disclosure controls and procedures and internal accounting and financial controls, and the annual independent audit process.

> In discharging its oversight role, the Committee is granted the authority to investigate any matter brought to its attention with full access to all books, records, facilities and personnel of the Company and the authority to engage independent counsel and other advisors, as it determines, in its sole discretion, necessary to carry out its duties. The Committee also is authorized to approve the use of Company funds to the extent it deems, in its sole discretion, such expenditures necessary or appropriate in carrying out the responsibilities of the Committee.

> The Committee shall be responsible for the appointment (and where appropriate, replacement), compensation, retention and oversight of the work of the Company's independent registered public accounting firm in preparing or issuing an audit report or related work, including resolving any disagreements between management and the independent registered public accounting firm regarding financial reporting. The Committee shall receive direct reports from the independent registered public accounting firm. The Committee shall be responsible for overseeing the independence of the independent registered public accounting firm and for approving all auditing services and permitted non-audit services provided by the independent registered public accounting firm to the Company. In addition, the Committee shall be responsible for preparing the disclosure required by Item 407(d)(3)(i) of Regulation S-K and the report required by the Securities and Exchange Commission (the "SEC") rules to be included in the Company's annual proxy statement.

> This Charter shall be reviewed for adequacy on an annual basis by the Committee and any changes thereto shall be submitted to the Board for approval.

68.     Under a section titled "Key Responsibilities," the Audit Committee Charter states the following, in relevant part:

> The Committee's role is one of oversight, and it is recognized that the Company's management is responsible for preparing the Company's financial statements and that the independent registered public accounting firm is responsible for auditing those financial statements. The following functions shall be the common recurring activities of the Committee in carrying out its oversight function. The functions are set forth as a guide and may be varied from time to time as appropriate under the circumstances.
>
> • The Committee shall review with management and the independent registered public accounting firm the audited financial statements to be included in the Company's Annual Report on Form 10-K and the Annual Report to Stockholders, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and shall review and consider with the independent registered public accounting firm the matters required to be discussed under generally accepted auditing standards, including AS 1301: Communications with Audit Committees, or other such requirements established by the Public Company Accounting Oversight Board.
>
> • As a whole, or through the Committee chair, the Committee shall review with the independent registered public accounting firm, prior to filing with the SEC, the Company's interim financial information to be included in the Company's Quarterly Reports on Form 10-Q and the matters required to be discussed by AS 4105: Reviews of Interim Financial Information or other such requirements established by the Public Company Accounting Oversight Board.
>
> • The Committee shall recommend to the Board whether, based on the reviews and discussions referred to above, the financial statements should be included in the Company's Annual Report on Form 10-K.
>
> • The Committee shall periodically discuss with management and the independent registered public accounting firm the effectiveness and adequacy of the Company's internal controls and internal auditing procedures, including any significant deficiencies or material weaknesses in the design or operation of those controls which could adversely affect the Company's ability to record, process, summarize and report financial data and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls, and discuss with the independent registered public accounting firm how the Company's financial systems and controls compare with industry practices.
>
> • The Committee shall periodically review with management and the independent registered public accounting firm the quality, as well as acceptability, of the

Company's accounting policies, and discuss with the independent registered public accounting firm how the Company's accounting policies compare with those in the industry and all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of use of such alternative disclosures and treatments and the treatment preferred by the independent registered public accounting firm.

• The Committee shall periodically discuss with the independent registered public accounting firm whether all material correcting adjustments identified by the independent registered public accounting firm in accordance with generally accepted accounting principles and the rules of the SEC are reflected in the Company's financial statements.

69.     The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

70.     Agenus is a Delaware-incorporated clinical-stage biotechnology company purportedly focused on developing therapies to activate the body's immune system against cancer and infections. The Company represents that its pipeline "includes immune-modulatory

antibodies, adoptive cell therapies (via MiNK Therapeutics, Inc. ('MiNK')), and vaccine adjuvants (via SaponiQx, Inc. ('SaponiQx'))" and that its primary focus is I-O. With respect to its focus on I-O, the Company has represented the following:

> To succeed in I-O, innovation and speed are paramount. We are a vertically integrated biotechnology company equipped with a suite of technology platforms to advance from novel target identification through manufacturing for clinical trials of antibodies and cell therapies. By understanding each patient's cancer, we aim to substantially expand the population benefiting from current I-O therapies. In addition to a diverse pipeline, we have assembled fully integrated end-to-end capabilities including novel target discovery, antibody generation, cell line development and cGMP manufacturing. Leveraging our science and capabilities, we have established strategic partnerships to advance innovation. We believe the next generation of cancer treatment will build on clinically validated antibodies targeting CTLA-4 and PD-1 combined with novel immunomodulatory agents designed to address underlying tumor escape mechanisms.

71.    The Company claims that its most advanced antibody candidates are: (1) botensilimab, a multifunctional immune cell activator and human Fc-enhanced cytotoxic T-lymphocyte antigen 4 (CTLA) blocking antibody, also known as AGEN1811, that has completed a Phase 2 clinical trial to treat second line cervical cancer; and (2) balstilimab, a programmed death receptor01 (PD-1) blocking antibody that is in a Phase 2 clinical trial for the treatment of pancreatic cancer and melanoma.

72.    The Company represents that it pursues clinical trials "designed to strengthen the efficacy and safety signals demonstrated to date and that may support a potential filing for full approval and/or accelerated approval based on the magnitude of benefit demonstrated" and, according to Agenus, its strategy "revolves around pioneering optimal combination treatments for cancer patients, with botensilimab as [its] cornerstone." The Company has largely focused on the development of the "botensilimab/balstilimab combination," Agenus's investigational therapy for the treatment of patients with metastatic CRC.

**False and Misleading Statements**

*January 23, 2023 Press Release*

73.     On January 23, 2023, during pre-market hours, the Company published a press release "announc[ing] clinical data from the MSS CRC (microsatellite stable colorectal cancer) 70 patient cohort of a Phase 1b study of botensilimab (multifunctional Fc-enhanced anti-CTLA-4) in combination with balstilimab (anti-PD-1) in patients with chemotherapy and/or immunotherapy-resistant tumors." In relevant part, the press release stated the following:

> The larger dataset continues to demonstrate that this combination offers superior efficacy and durability compared to what has been reported for standard of care and other investigational therapies in third line metastatic MSS CRC. The data were presented in the opening late-breaking oral session at the American Society of Clinical Oncology - Gastrointestinal Cancers Symposium (ASCO GI) in San Francisco, CA on Saturday Jan 21 2023.
>
> "***This data highlight the deep and durable responses achieved with botensilimab and balstilimab in advanced MSS CRC, underscoring remarkable benefit for these patients who have failed standard of care or other investigative therapies. With over 300 patients enrolled to date, botensilimab alone and in combination with balstilimab have demonstrated durable clinical responses across nine cold and treatment-resistant cancers***," said [Defendant] O'Day[.] "Our top priority is to advance this combination in global randomized trials with the intent to bring this important treatment to patients expeditiously."
>
> "MSS CRC accounts for over 95% of metastatic CRC cases and is characterized by tremendous unmet need, as available treatments have reported single digit responses rates," said Anthony El-Khoueiry, MD, Phase I Program Director and Associate Director for Clinical Research at the USC Norris Comprehensive Cancer Center, Keck Medicine of USC, and the Principal Investigator for the study. "The 23% response rate demonstrated by botensilimab plus balstilimab in this study supports rapid development of this combination in MSS CRC."[3]

*March 14, 2023 Press Release and Earnings Call*

74.     On March 14, 2023, the Company published a press release announcing its financial results for the fourth quarter and full year ended December 31, 2022 (the "2022 Fiscal Year"). In relevant part, the press release stated the following:

---

[3] All emphasis has been added unless otherwise noted herein.

"Agenus has entered 2023 with strong momentum across our extensive and diverse clinical pipeline of immuno-oncology programs. Our anchor programs, botensilimab (Fc-enhanced, multi-functional anti-CTLA-4) and balstilimab (anti-PD-1), show exciting potential in combination to treat a broad spectrum of treatment-resistant cancers," said [Defendant] Armen[.] "With the growing body of data demonstrating robust, consistent, and durable efficacy signals from a trial of over 300 patients across nine metastatic, late-line cancers, we are expediting the expansion of our botensilimab/balstilimab development program in MSS CRC and other priority indications."

"The number of patients with solid tumors resistant to a variety of therapies, including current immunotherapies, is substantial. Existing treatment options for these patients after failure of initial standard treatments are limited and largely ineffective, resulting in a short overall survival rate," said [Defendant] O'Day[.] "***Botensilimab's clinical activity in advanced and refractory cancers has generated considerable interest from experts worldwide***."

**2022 Highlights**

**Botensilimab: Wholly Owned Lead Clinical Asset**

Botensilimab's clinical results have been presented at a late-breaking oral session at the American Society of Clinical Oncology (ASCO GI) in 2023, and in plenary sessions at the European Society for Medical Oncology (ESMO-GI), Connective Tissue Oncology Society (CTOS), the Society for Immunotherapy of Cancer (SITC) 2022 annual meetings, as well as at a company-hosted R&D Event ('The Road Taken'). ***The latest clinical study results, including those of the botensilimab and botensilimab/balstilimab combination, demonstrate durable responses and significant benefits compared to that reported for standard of care and other investigational therapies in patients with treatment-resistant tumors***.

75.     That same day, the Company held an earnings call with investors and analysts to discuss its fourth quarter and full 2022 Fiscal Year financial results. During the scripted portion of the call, Defendant Armen stated the following, in relevant part:

Our portfolio is designed to address areas of high patient need and to unlock the large untapped market opportunity in cold and treatment-resistant cancers. And on top of that, to provide benefit beyond what is currently available with I-O treatments in other tumors, including hot tumors. At the forefront of our pipeline is botensilimab a clinical stage multifunctional Fc-enhanced CTLA-4 antibody with potentially blockbuster capabilities.

Over the last 12 months, we've made substantive progress addressing the ongoing botensilimab development program, including having dosed over 300 heavily

pretreated patients with advanced solid tumors as part of our Phase 1b trial. That's a very large trial in account. And we've done this with [] monotherapy and in combination with our [. . .] PD-1 antibody balstilimab. Botensilimab has produced durable objective responses in nine cold and/or treatment resistant cancers, including MSS colorectal cancer and MSS stands for microsatellite stable cancers that are particularly challenging to treat with immunotherapy.

So, we've seen results in MSS colorectal cancer, MSS endometrial cancer, platinum-resistant refractory ovarian cancer, PD-1 resistant refractory non-small cell lung cancer, PD-1 and CTLA-4 resistant refractory melanoma, a particularly challenging patient population. PD-1 resistant refractory hepatocellular carcinoma, PD-1 resistant refractory cervical cancer, angiosarcoma and liposarcoma, this is a very extensive list of difficult-to-treat cancers that had been treated and failed prior treatments.

***

We are thrilled by the clinical results we have seen with botensilimab and are excited about its potential to positively impact the treatment landscape for patients obviously suffering for cancer, all kinds of cancers.

### March 16, 2023 Form 10-K

76.     On March 16, 2023, the Company filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 10-K"). The 2022 10-K was signed by Defendants Armen, Klaskin, Corvese, Hirsch, Jeynes-Ellis, Wiinberg, and Wright and contained Sarbanes Oxley Act of 2002 ("SOX") certifications signed by Defendants Armen and Klaskin attesting to its accuracy. In its discussion of Agenus's business, the 2022 10-K stated the following, in relevant part:

**Our Business**

We are a clinical-stage company with a pipeline of therapies designed to activate the body's immune system to fight cancer and infections, including immune-modulatory antibodies, adoptive cell therapies (through our subsidiary MiNK Therapeutics, Inc. ("MiNK")) and vaccine adjuvants (through our subsidiary SaponiQx, Inc. ("SaponiQx")). This robust product pipeline is supported by our in-house capabilities, including current good manufacturing practice ("cGMP") manufacturing and a clinical operations platform. Our primary focus is immuno-oncology ("I-O"), and our business is designed to drive success through speed, innovation and effective combination therapies. We believe that a deep understanding of each patient's cancer and the potential to deliver combination therapies will drive substantial expansion of the patient population benefiting from current I-O therapies. In addition to a diverse pipeline, we have assembled fully integrated end-to-end capabilities including novel target discovery, antibody

generation, cell line development and cGMP manufacturing. We believe that these fully integrated capabilities enable us to produce novel candidates on timelines that are shorter than the industry standard. Leveraging our science and capabilities, we have forged important partnerships to advance our innovation.

We believe the next generation of cancer treatment will build on clinically validated antibodies targeting CTLA-4 and PD-1 combined with novel immunomodulatory agents designed to address underlying tumor escape mechanisms. Our most advanced antibody candidates are botensilimab (a proprietary next-generation Fc-engineered CTLA-4 antibody, also known as AGEN1811) and balstilimab (a PD-1 antibody).

77.     Moreover, in discussing Agenus's "vision," the 2022 10-K stated:

We believe that combination therapies and a deep understanding of each patient's cancer will be key drivers of success in substantially expanding the patient population benefiting from current I-O therapies. In addition, delivering innovation with speed is critical for our future success, as drug development timelines in oncology shorten while product obsolescence rates climb. We believe our fully integrated, end-to-end capabilities from our artificial intelligence-powered VISION platform for novel target discovery, antibody generation, and cell line development to our cGMP manufacturing and clinical development and operations capabilities, together with a comprehensive and complementary portfolio will uniquely position us to produce novel therapies on accelerated timelines. We believe that a balanced pipeline of product candidates should focus on both validated targets as well as novel targets designed to address tumor escape mechanisms. In this context, CTLA-4 and PD-1 antagonists are recognized as the first clinically validated immunotherapy combination. These therapeutic targets, in combination with innovative immunomodulatory antibodies, cell therapies, or immune educating vaccines, are reasonably anticipated to be focal points of the next generation of IO combination therapies. Therefore, we plan to develop, register and launch proprietary antibodies targeting PD-1 and CTLA-4 aggressively through the clinic and expand with novel combination therapies designed to improve clinical response and the durability of response of existing therapies.

78.     With respect to the Company's strategy, the 2022 10-K stated the following, in

relevant part:

Our strategy is to bring innovative combination therapies for cancer patients to substantially expand the patient population benefiting from current I-O therapies. Our diverse pipeline of antibody-based therapeutics, cell therapies, and vaccine adjuvants enable us to pursue therapeutically relevant approaches focused on safe and effective therapeutic agent combinations. In line with this approach, we are pursuing clinical trials designed to strengthen the efficacy and safety signals

demonstrated to date and that may support a potential filing for full approval and/or accelerated approval based on the magnitude of benefit demonstrated.

***March 27, 2023 Press Release***

79.     On March 27, 2023, Agenus released a press release titled "Agenus' Botensilimab in Combination with Balstilimab Shows 33% Durable Responses in Ovarian Cancer." In relevant part, the press release stated:

> Agenus [. . .] today announced results from a cohort of 24 evaluable patients in an expansion of the Company's Phase 1b study of botensilimab (multifunctional CTLA-4 antibody) in combination with balstilimab (PD-1 antibody) in patients with recurrent platinum resistant/refractory ovarian cancer. These findings, presented in an oral plenary session at the Society of Gynecologic Oncology (SGO) 2023 Annual Meeting on Women's Cancer, showed a 33% overall response rate (ORR).

> "These results add to the growing body of data showing deep and durable efficacy signals for botensilimab across nine cold and treatment-resistant cancers," said [Defendant] O'Day[.] "***Botensilimab is designed with a unique mechanism of action that stimulates both innate and adaptive immune responses against cancer, resulting in an improved benefit compared to what has been reported for other checkpoint therapies***."

> "The combination of botensilimab and balstilimab in platinum-resistant ovarian cancer shows promise for a substantial improvement in efficacy compared to existing therapies, which typically only yield single-digit response rates," said Bruno Bockorny, M.D., Harvard Medical School, Beth Israel Deaconess Medical Center, and principal investigator for the study. "The remarkable efficacy and manageable tolerability profile of this combination suggest a transformative potential for ovarian cancer patients."

***April 17, 2023 Press Release***

80.     On April 17, 2023, Agenus released a press release titled "Agenus Receives Fast Track Designation for Botensilimab and Balstilimab in Colorectal Cancer." In relevant part, the press release stated:

> Agenus [. . .] has been granted Fast Track Designation from the US Food and Drug Administration (FDA) for the investigation of the combination of botensilimab (AGEN1181) and balstilimab (AGEN2034). The designation is for patients with non-microsatellite instability-high (MSI-H)/deficient mismatch repair (dMMR)

metastatic colorectal cancer with no active liver involvement. Patients targeted with this designation are heavily pretreated are resistant or intolerant to a fluoropyrimidine, oxaliplatin, and irinotecan, and who have also received a VEGF inhibitor, an EGFR inhibitor and/or a BRAF inhibitor, if indicated. The company is conducting a global, randomized Phase 2 trial of botensilimab in combination with balstilimab compared to standard of care in non-microsatellite instability-high (non-MSI-H) colorectal cancer patients.

"We are pleased that the FDA has granted Fast Track designation for the combination of botensilimab with balstilimab in patients with non-MSI-H colorectal cancer, recognizing the high unmet medical need in this population," said [Defendant] O'Day[.] "The Fast Track designation offers important benefits, including the potential eligibility for a Priority Review, and we will be working with the FDA and all key stakeholders to rapidly advance the botensilimab/balstilimab combination in colorectal cancer as well as other solid tumor indications."

### *2023 Proxy Statement*

81.     On April 28, 2023, Agenus filed the 2023 Proxy Statement with the SEC. Defendants Armen, Hirsch, Wiinberg, Corvese, Wright, and Jeynes-Ellis solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

82.     The 2023 Proxy Statement called for Company shareholders to, *inter alia*: (1) re-elect Defendants Armen, Hirsch, and Wiinberg to the Board; (2) approve, via a non-binding advisory vote, the compensation of the Company's named executive officers; and (3) ratify the appointment of KPMG LLP as Agenus's independent registered public accounting first for the 2023 Fiscal Year.

83.     Regarding "Role of Our Board," the 2023 Proxy Statement stated the following:

**Role of Our Board**

The Board monitors our overall corporate performance, the integrity of our financial controls, risk management and legal compliance procedures. It appoints senior management and oversees succession planning and senior management's performance and compensation. The Board also oversees our short- and long-term

strategic and business planning, and reviews with management its business plan, financing plans, budget, and other key financial and business objectives.

Members of the Board keep informed about our business through discussions with our Chief Executive Officer and other members of our senior management team, by reviewing materials provided to them by management on a regular basis and in preparation for Board and committee meetings, and by participating in meetings of the Board and its committees. Senior management regularly reviews key portions of our business and its progress with the Board. These practices afford the Board members the opportunity to actively participate in risk management assessment and raise questions and engage in discussions with management regarding areas of potential risk and opportunities to mitigate such risk. The Audit and Finance Committee of the Board reviews the risk management practices of the Company and in particular the Company's approach to cyber risks and mitigation efforts, and both the Corporate Governance and Nominating Committee and the Audit and Finance Committee receive periodic updates from the Company's senior management outlining areas of compliance focus and proposed recommendations. Additionally, the Compensation Committee reviews the Company's executive compensation program and the incentives created by the executive compensation program, to assess whether our compensation arrangements encourage excessive or properly calibrate risk-taking by our executives.

We introduce our senior executives and other strategic employees to the Board so that the Board can become familiar with our key talent. Timothy R. Wright, our Lead Director, introduces each new Board member to our Corporate Governance policies and their responsibilities to the Company as a director. Each Board member receives a Board of Directors handbook that provides the director with a summary of these practices and policies.

    84.    Regarding the Code of Conduct, the 2023 Proxy Statement stated the following, in

relevant part:

**Code of Business Conduct and Ethics and Securities Trading Policies**

The Board originally adopted our Code of Business Conduct and Ethics in 2003. The Board reviewed, revised, and updated the Code of Business Conduct and Ethics most recently in January 2023. The Code of Business Conduct and Ethics applies to all members of the Board and all employees of Agenus, including our Chief Executive Officer, and Principal Financial and Accounting Officer. In addition, Agenus has a Securities Trading Policy, which was updated and reviewed and approved by the Board in January 2023. Among other matters, both our Code of Business Conduct and Ethics and Securities Trading Policy prohibit the members of the Board and all employees of Agenus from buying or selling our securities while in possession of material, non-public information about the Company. Our Code of Business Conduct and Ethics and Securities Trading Policy are each posted

on the corporate governance section of our website at https://investor.agenusbio.com/corporate-governance. No material on our website is part of this proxy statement. We intend to post on our website all disclosures that are required by law or Nasdaq listing rules concerning any amendments to our Code of Business Conduct and Ethics.

85. Under the direction and watch of Defendants Armen, Hirsch, Wiinberg, Corvese, Wright, and Jeynes-Ellis, the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company's botensilimab and balstilimab combination therapy was not as effective as Defendants had led investors to believe; and (2) due to the foregoing, the botensilimab and balstilimab combination therapy's clinical results and regulatory and commercial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

86. The 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

87. As a result of Defendants Armen, Hirsch, Wiinberg, Corvese, Wright, and Jeynes-Ellis causing the 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendants Armen, Hirsch, and Wiinberg to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, via a non-binding advisory vote, the compensation of the Company's named executive officers; and (3) ratify the appointment of KPMG LLP as Agenus's independent registered public accounting first for the 2023 Fiscal Year.

*May 9, 2023 Press Release and Earnings Call*

88.     On May 9, 2023, the Company released a press release announcing its financial results for the first quarter of the 2023 Fiscal Year. In relevant part, the press release stated:

> "With over 350 patients dosed with botensilimab in our Phase 1 study, we have demonstrated 20-50% response rates in 9 solid tumor cancers. These results suggest that botensilimab could provide significant benefit to patients who have not responded to or failed other available treatments," said [Defendant] Armen[.] "Agenus is committed to advancing our development programs to make botensilimab available to patients ASAP."

89.     The same day, the Company hosted an earnings call with investors and analysts to discuss the results. During the scripted portion of the call, Defendant Armen stated the following, in relevant part:

> Botensilimab, our innovative and multi-functional CTLA-4 anybody aims to revolutionize cancer treatment by extending clinical benefit to cold tumors, which have historically been unresponsive to standard-of-care and other immunotherapy agents, including other CTLA-4 anybody. And, impressively, botensilimab has demonstrated clinical responses in both cold and hot tumors. In a diverse patient population of nearly 400 individuals, across nine solid tumor types, all of them had exhausted prior treatment options botensilimab has made significant strides in eliciting responses, offering renewed hope for those who have failed all other available treatments.
>
> Let's take a closer look at response rates achieved with botensilimab. Across all nine solid tumors, we've observed remarkable response rates of up to 50% in highly refractory cancers. This is truly an impressive accomplishment considering the patient population involved. Notably many of these responses have proven to be durable responses. This is a critical factor in evaluating a treatment potential to transform patient's lives in a meaningful way.
>
> But the story doesn't end there, preliminary data suggest that Botensilimab may be exceptionally effective in colorectal cancer patients with whole tumors that have historically been unresponsive to immunotherapy. Even in hot tumors that have failed standard-of-care, including immunotherapy, of course, with or without chemotherapy, we are witnessing unprecedented responses.
> ***
> The clinical data generated with botensilimab is truly inspiring. And we're thrilled with the progress we've made thus far. We firmly believe that botensilimab has the potential to reshape how we approach treating solid tumors and we eagerly look forward to further advancements in this crucial program. With our more advanced

programs, as well as on our regulatory front, we're also making significant strides. Our Phase 2 activate studies in colorectal, melanoma and pancreatic cancers are set to conclude enrollment in 2023.

And we are expediting enrollment into our refractory non-small cell lung cancer cohorts where we have previously reported 50% response rates in patients who have failed prior PD-1 and chemotherapy. We plan to launch a randomized Phase 3 study in the observed response rates persist in the extended cohort in non-small cell lung cancer. ***We're also proud to announce the fact that balstilimab combination has generated or has been granted Fast Track Designation by the FDA for treating non-MSI high colorectal patients without active liver metastasis. This acknowledgment of our potential to fulfill a significant unmet medical need could accelerate the development and review of our application for approval***.

***June 30, 2023 Press Release***

90.    On June 30, 2023, the Company released a press release titled "ESMO GI Data:

Agenus' Botensilimab/Balstilimab Combination Achieves Unprecedented Survival in Advanced

Colorectal Cancer." In relevant part, the press release stated:

> Agenus [. . .] shared promising data today from its Phase 1b trial on the botensilimab and balstilimab combination at a late-breaking session at the 2023 ESMO World Congress on Gastrointestinal Cancer (ESMO GI). The new data show substantial survival benefits and long-lasting responses for patients with non-MSI-H (microsatellite stable or non-microsatellite instability-high) metastatic colorectal cancer previously resistant to chemotherapy and/or immunotherapy.
> "The data from our expanded cohort demonstrate remarkable median overall survival and sustained responses in heavily pre-treated patients that historically haven't responded to immunotherapy. ***These findings provide evidence of the benefit of botensilimab/balstilimab in metastatic colorectal cancer, the second leading cause of cancer death in the U.S.***," said [Defendant] O'Day[.] "Our clinical research has shown confirmed responses in 8 other refractory tumor types, indicating the potential to transform clinical practice and patient outcomes for multiple challenging cancers."

***August 8, 2023 Press Release***

91.    On August 8, 2023, the Company released a press release announcing its financial

results for the second quarter of the 2023 Fiscal Year. In relevant part, the press release stated:

> "Botensilimab, alone or in combination with balstilimab, continues to display remarkable clinical activity in over 600 patients treated across nine late-stage, treatment resistant solid tumor cancers, demonstrating great potential to

revolutionize the role of immunotherapy in cancer treatment," said [Defendant] Armen[.] "Agenus is committed to advancing our diverse clinical pipeline with a focus on expediting our first regulatory submission for the botensilimab/balstilimab combination in colorectal cancer. Our data has demonstrated an unprecedented survival benefit over what has been reported for standard of care, underscoring this combination as an important potential treatment option for patients with non-MSI-high colorectal cancer, which represents 85% of the population of patients with colorectal cancer[.]"

***August 23, 2023 Press Release***

92.    On August 23, 2023, the Company released a press release titled "Agenus Prioritizes Resources to Accelerate Registration and Commercialization of BOT/BAL Program in Multiple Cancers." In relevant part, the press release stated:

> Agenus [. . .] today announced a strategic initiative to prioritize and focus resources to accelerate the development, registration, and commercialization of its flagship program botensilimab/balstilimab (BOT/BAL). Under this new plan, Agenus will temporarily postpone all preclinical and clinical programs not related to BOT/BAL. The plan will result in a workforce reduction of approximately 25% and deliver approximately $40 million in savings by the end of 2023.

> The plan will reduce operating expenses across Agenus' global organization by concentrating its quality, manufacturing, clinical, regulatory, and research & development resources on the BOT/BAL program and drive commercial readiness.

> "Now is the pivotal moment to concentrate our efforts on the BOT/BAL program. The observed clinical benefit in solid tumors underscores the program's game changing potential, and our rapid progress towards a first filing in 2024 highlights the necessity for prioritization in every aspect of our operations," said [Defendant] Armen[.] "By zeroing in on BOT/BAL, we expect to expedite regulatory approval and availability for healthcare providers and patients in need. Our decision to streamline operations reflects our commitment to the success of these programs while optimizing shareholder value."

***October 22, 2023 Press Release***

93.    On October 22, 2023, Agenus released a press release titled "Agenus Unveils New and Updated Botensilimab Data in Colorectal, Pancreatic, Lung, Melanoma, and Sarcoma." In relevant part, the press release stated:

Agenus [. . .] today announced first-time and updated data from its ongoing botensilimab/balstilimab (BOT/BAL) clinical programs in advanced colorectal cancer (CRC), neoadjuvant CRC, pancreatic cancer, non-small cell lung cancer (NSCLC), melanoma, and sarcoma.

\*\*\*

"These new and updated data underscore BOT's broad effectiveness across several advanced solid tumors, demonstrating its potential beyond first-generation immunotherapies and current treatments," said [Defendant] O'Day[.] "***BOT's versatility, alone, in combination with BAL, or in combination with other standard of care therapies, in early and late-stage solid tumors, positions Agenus to transform cancer care, offering immense promise to patients***."

***November 7, 2023 Press Release and Earnings Call***

94.     On November 7, 2023, the Company released a press release announcing its financial results for the third quarter of the 2023 Fiscal Year. In relevant part, the press release stated:

"The botensilimab franchise, after treating more than 750 patients, has demonstrated consistent tumor responses across a diverse range of nine tumor types, showcasing its potential for significant impact in oncology," said [Defendant] Armen[.] "***The emerging data indicating the efficacy of botensilimab in earlier stages of cancer marks a notable shift towards less invasive treatment options. Agenus is forging ahead with a focus on our regulatory filing in CRC, advancing our robust clinical pipeline, and committing to deliver substantial outcomes for patients and create value for our shareholders***."

95.     The same day, the Company held an earnings call with analysts and investors to discuss the financial results. During a scripted portion of the call, Defendant Armen stated the following, in relevant part:

Moving forward, we're concentrating on three key priorities; submitting our first biologics license application for colorectal cancer, prioritizing other clinical programs with the potential for rapid approval, and importantly, to mark reallocating resources to achieve our goals. Accordingly, we're gearing up our first BOT/BAL BLA submission in mid-2024, with a focus on late-stage colorectal cancer.

\*\*\*

The cancer community's enthusiasm and rapid enrolment in our Phase II clinical trial in MSS-CRC, highlights an urgent unmet need. To address this, we have started a compassionate use program with the AMO broadening it into an expanded access program next year. With very limited options to treat patients with advanced

colorectal cancer, the positive trends and lasting responses in our studies strengthen our conviction in BOT/BAL potential. Our top priority is obtaining BOT/BAL approval in MSS-CRC in order to allow patients access to this important IO treatment, offering them new hope, which does not exist today.

***January 22, 2024 Press Release***

96.    On January 22, 2024, the Company issued a press release "announc[ing] results from the NEST-1 study, an investigator-sponsored trial (IST) evaluating the combination of botensilimab and balstilimab (BOT/BAL) in the neoadjuvant setting for colorectal cancer (CRC), both those with Microsatellite Stable (MSS) CRC and Microsatellite Instability High (MSI-H) CRC." In relevant part, the press release stated:

> "BOT/BAL's potential impact on colorectal cancer is groundbreaking. The study's findings, particularly the significant tumor regression after only a single dose of BOT and two doses of BAL, and the complete elimination of ctDNA in 100% of patients tested, offer a potentially transformative treatment approach for CRC patients diagnosed with early stage and locally advanced colon and rectal cancers. These results hold great promise for patients and providers as a framework for reduced reliance on chemotherapy and/or surgical resection," said Dr. Pashtoon Kasi, M.D., Director of Colon Cancer Research at Weill-Cornell Medicine and lead investigator of the NEST-1 study.

***March 14, 2024 Press Release and Earnings Call***

97.    On March 14, 2024, the Company released a press release announcing its financial results for the fourth quarter and full 2023 Fiscal Year. In relevant part, the press release stated:

> "In 2023, Agenus made significant advances across our BOT/BAL development program. Our first target indication is metastatic, refractory colorectal cancer that is not MSI-H/dMMR, for which we are focused on pursuing accelerated approval," said [Defendant] Armen[.] "We are also pursuing multiple strategies to capitalize the company through this important path in our efforts to bring BOT and BOT/BAL to the forefront of solid tumor cancer treatment. Our vision is to maximize BOT's utility to benefit patients in combination with other immune therapies as well as current standards of care for patients with both early and late-stage tumors."

98.     The same day, the Company held an earnings call with investors and analysts to discuss these financial results. During the scripted portion of the call, Defendant Armen stated the following, in relevant part:

In 2023, Agenus reached crucial milestones, particularly with our BOT/BAL program, a cornerstone of our operational focus. BOT/BAL therapy has undergone rigorous testing in over 900 patients, demonstrating promising activity in cancers that represent significant unmet medical needs, notably colon cancer, where we are poised for potential first approval.

The impressive response rates, sustained durability and overall clinical efficacy observed across multiple challenging cancer types have garnered attention and excitement from leading experts in the field. It is essential to note that the patients enrolled in our trials have exhausted available standard treatments, making clinical responses achieved all the more meaningful.

\*\*\*

The resounding feedback from over 1,000 physicians we engaged with over the past year, underscores the transformative impact of our work and the impact it could have on patient care. Furthermore, the fast track designation granted by the FDA acknowledges the urgent need for new treatments in our lead indications, which is refractory, MSS-CRC in non-liver metastatic patients.

As we stand on the threshold of a clinical and a critical phase in our regulatory journey, our focus is squarely on advancing activities for a potential accelerated approval filing. Our immediate efforts are directed towards ensuring that our development strategies align seamlessly with the FDA's rigorous standards. In 2024, our primary objective is to pursue a global regulatory strategy for BOT/BAL in our fast track indication.

Following alignment with the FDA, we intend to initiate the submission of our Biologics License Application, otherwise known as a BLA, for potential accelerated approval.

\*\*\*

Additionally, by the end of 2024, we anticipate initiating a Phase 3 study in the patient population of our proposed indication. Our commitment to transparency and stakeholder engagement remains unwavering as we progress towards delivering these potentially life altering treatments to patients. Looking ahead, our mission to enhance the lives of cancer patients to the power of the immune system remains steadfast. That's been our mission from day one, 30 years ago, of course, today, with BOT/BAL leading the charge in our dynamic portfolio of agents.

***March 14, 2024 Form 10-K***

99.     Also on March 14, 2024, the Company filed its annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Armen, Klaskin, Corvese, Hirsch, Jeynes-Ellis, Wiinberg, and Wright and contained SOX certifications by Defendants Armen and Klaskin attesting to its accuracy.

100.     The 2023 10-K contained substantively similar discussions of Agenus, its "vision," and its strategy, as discussed in the 2022 10-K (*supra*, in ¶¶76-78).

### April 12, 2024 Press Release

101.     On April 12, 2024, Agenus released a press release titled "Agenus Announces Updated Phase 1 Data and Progress on BOT/BAL Development in Metastatic MSS Colorectal Cancer." In relevant part, the press release stated:

> "These results underscore the potential of BOT/BAL in metastatic CRC, the second leading cause of cancer mortality in the U.S.," said [Defendant] O'Day[.] "We continue to work expeditiously to bring this promising combination to patients in need."

> Pending planned meetings with the FDA, Agenus plans to submit a Biologics License Application (BLA) for BOT/BAL in refractory MSS CRC later this year and plans to present detailed Phase 2 efficacy results, including response durability and updated Phase 1 survival data, at a major medical conference in the second half of 2024. This growing body of clinical evidence underscores the significant potential of BOT/BAL to transform the treatment landscape for difficult-to-treat solid tumors.

### 2024 Proxy Statement

102.     On April 26, 2024, Agenus filed the 2024 Proxy Statement with the SEC. Defendants Armen, Hirsch, Wiinberg, Corvese, Wright, and Jeynes-Ellis solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

103.     The 2024 Proxy Statement called for Company shareholders to, *inter alia*: (1) re-elect Defendant Hirsch to the Board; and (2) approve an amendment to the Company's Amended

and Restated 2019 Equity Incentive Plan (the "Plan"), which would increase the number of shares available for issuance thereunder by 3,000,000 shares.

104.    Regarding "Role of Our Board," the 2024 Proxy Statement stated the following:

**Role of Our Board**

The Board monitors our overall corporate performance, the integrity of our financial controls, risk management and legal compliance procedures. It appoints senior management and oversees succession planning and senior management's performance and compensation. The Board also oversees our short- and long-term strategic and business planning, and reviews with management its business plan, financing plans, budget, and other key financial and business objectives.

Members of the Board keep informed about our business through discussions with our Chief Executive Officer and other members of our senior management team, by reviewing materials provided to them by management on a regular basis and in preparation for Board and committee meetings, and by participating in meetings of the Board and its committees. Senior management regularly reviews key portions of our business and its progress with the Board. These practices afford the Board members the opportunity to actively participate in risk management assessment and raise questions and engage in discussions with management regarding areas of potential risk and opportunities to mitigate such risk. The Audit and Finance Committee of the Board reviews the risk management practices of the Company and in particular the Company's approach to cyber risks and mitigation efforts, and both the Corporate Governance and Nominating Committee and the Audit and Finance Committee receive periodic updates from the Company's senior management outlining areas of compliance focus and proposed recommendations. Additionally, the Compensation Committee reviews the Company's executive compensation program and the incentives created by the executive compensation program, to assess whether our compensation arrangements encourage excessive or properly calibrate risk-taking by our executives.

We introduce our senior executives and other strategic employees to the Board so that the Board can become familiar with our key talent. Timothy R. Wright, our Lead Director, introduces each new Board member to our Corporate Governance policies and their responsibilities to the Company as a director. Each Board member receives a Board of Directors handbook that provides the director with a summary of these practices and policies.

105.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following, in relevant part:

**Code of Business Conduct and Ethics and Securities Trading Policies**

The Board originally adopted our Code of Business Conduct and Ethics in 2003. The Board reviewed, revised, and updated the Code of Business Conduct and Ethics most recently in January 2024. The Code of Business Conduct and Ethics applies to all members of the Board and all employees of Agenus, including our Chief Executive Officer, and Principal Financial and Accounting Officer. In addition, Agenus has a Securities Trading Policy, which was updated and reviewed and approved by the Board in January 2023. Among other matters, both our Code of Business Conduct and Ethics and Securities Trading Policy prohibit the members of the Board and all employees of Agenus from buying or selling our securities while in possession of material, non-public information about the Company. Our Code of Business Conduct and Ethics and Securities Trading Policy are each posted on the corporate governance section of our website at *https://investor.agenusbio.com/corporate-governance*. No material on our website is part of this proxy statement. We intend to post on our website all disclosures that are required by law or Nasdaq listing rules concerning any amendments to our Code of Business Conduct and Ethics.

106.    With respect to the proposal to amend the Plan, the 2024 Proxy Statement stated

the following, in relevant part:

**PROPOSAL 2— TO APPROVE AN AMENDMENT TO OUR AMENDED AND RESTATED 2019 EQUITY INCENTIVE PLAN**

Our Amended and Restated 2019 Equity Incentive Plan (our "2019 EIP") was originally approved by our stockholders on June 19, 2019, and has subsequently been amended and restated. On October 11, 2023, January 17, 2024 and April 25, 2024 the Board approved, subject to stockholder approval, a subsequent amendment and restatement of our 2019 EIP, which includes the following changes to our 2019 EIP (our "2019 EIP, as Amended and Restated"):

    1. An amendment to increase the maximum number of shares of our common stock available for issuance under our 2019 EIP by 3,000,000 shares.

    2. Updates to our 2019 EIP's limits on individual awards, including revised limits on individual awards for non-employee directors and elmination of other individual limits.

    3. Updates to our 2019 EIP's one-year minimum vesting requirement.

    4. Technical updates to various provisions of our 2019 EIP.

If stockholders do not approve this Proposal 2, our 2019 EIP, as Amended and Restated, will not become effective and our 2019 EIP will remain in effect in accordance with its terms. In addition, if stockholders do not approve this Proposal 2, certain awards that were granted to our employees contingent upon obtaining stockholder approval of our 2019 EIP, as Amended and Restated, as described in more detail under "New Plan Benefits," will be automatically forfeited. The material terms of our 2019 EIP, as Amended and Restated, are described under

"Summary of our 2019 EIP, as Amended and Restated" below. Numbers reported
in this Proposal 2 give effect to the one-for-twenty reverse stock split.

107.    Under the direction and watch of Defendants Armen, Hirsch, Wiinberg, Corvese, Wright, and Jeynes-Ellis, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company's botensilimab and balstilimab combination therapy was not as effective as Defendants had led investors to believe; and (2) due to the foregoing, the botensilimab and balstilimab combination therapy's clinical results and regulatory and commercial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

108.    The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

109.    As a result of Defendants Armen, Hirsch, Wiinberg, Corvese, Wright, and Jeynes-Ellis causing the 2024 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendant Hirsch to the Board, thereby allowing her to continue breaching her fiduciary duties to the Company; and (2) approve the proposed amendment to the Plan, thereby increasing the number of shares available for issuance thereunder by 3,000,000 shares.

### *May 7, 2024 Press Release and Earnings Call*

110.    On May 7, 2024, the Company released a press release announcing its financial results for the first quarter of 2024. In relevant part, the press release stated:

"We are thrilled to announce a significant $100 million royalty financing agreement with Ligand, a milestone that investors have eagerly anticipated. This capital infusion is pivotal for advancing the development and market readiness of our BOT/BAL treatment," said [Defendant] Armen[.] He continued, "The BOT/BAL combination has consistently demonstrated deep and durable responses in 'cold' solid tumors, especially in our advanced studies of relapsed/refractory MSS CRC. With the promising results we have seen, and additional data from our ongoing Phase 2 study, we plan to engage with the FDA in the second half of 2024. Pending the outcomes of these discussions, we aim to commence the submission of a Biologics License Application under the accelerated approval provision for BOT/BAL in refractory MSS CRC NLM."

111.    The same day, the Company held an earnings call with analysts and investors to discuss these financial results. During the scripted portion of the call, Defendant Armen stated the following, in relevant part:

Today as we edge closer to realizing our goals with our leading BOT/BAL program, I am thrilled to share a significant milestone that will propel us into the next phase of our journey. This morning we announced that we entered into $100 million loyalty financing agreement with Ligand Pharmaceuticals. It is very important to realize that this agreement allows us to keep BOT/BAL in its entirety and also open up our options to bring in partners for this program. This clinical minimally diluted capital infusion will support key development initiatives in the BOT/BAL program including our planned confirmatory Phase 3 study in relapsed refractory MSS-CRC which stands for stem-cell [ph] colorectal cancer, and our commercialization readiness activities which are currently underway.

112.    Also during the scripted portion of the call, Defendant O'Day stated the following, in relevant part:

Botensilimab in combination with Balstilimab has demonstrated deep and durable responses across a wide variety of poorly immunogenic or IO refractory solid tumors. These poorly immunogenic tumors represent the majority of adults with cancer and a this large group of patients have not previously benefited from the success of established IO therapies. Currently, our BOT/BAL program is focused on our lead indications, relapsed refractory colorectal cancer, which is not MSI high or DMMR, and is without active liver metastasis.

***May 16, 2024 Press Release***

45

113.   On May 16, 2024, the Company published a press release titled "FDA Grants Agenus Type B End-of-Phase 2 Meeting to Discuss BOT/BAL Therapy for Relapsed or Refractory Metastatic Colorectal Cancer." In relevant part, the press release stated the following:

"Our upcoming End of Phase 2 meeting with the FDA represents a significant milestone in the ongoing development of BOT/BAL for patients diagnosed with metastatic MSS CRC who do not have active liver metastases," stated [Defendant] O'Day[.] "The results from our Phase 1 and Phase 2 studies contribute valuable insights into the potential of this therapy for managing a specific and challenging subgroup of colorectal cancer. We remain dedicated to further exploring innovative immunotherapeutic strategies."

***May 23, 2024 Press Release***

114.   On May 23, 2024, the Company published a press release titled "Breakthrough Data on Botensilimab/Balstilimab in MSS CRC Presented at the 2024 ASCO Annual Meeting." In relevant part, the press release stated the following:

Agenus [. . .] today announced a novel analysis from the Phase 1b trial of botensilimab in combination with balstilimab (BOT/BAL) in relapsed/refractory microsatellite stable colorectal cancer (r/r MSS CRC) with no active liver metastases (NLM) will be presented at the upcoming 2024 American Society of Clinical Oncology (ASCO) Annual Meeting on June 1, 2024. The analysis shows that BOT/BAL is active in metastatic sites beyond the lungs and lymph nodes, including the peritoneum, soft tissue, and brain, which have historically been unresponsive to treatment.

"The findings observed in this analysis are notable in that they are seen within challenging and historically unresponsive metastatic sites of disease," said [Defendant] O'Day[.] "Seeing broad activity beyond the lungs and lymph nodes is rare for immunotherapy in MSS mCRC, making BOT/BAL stand out from other treatments. We are committed to advancing BOT/BAL for those living with cancer, with the intent to provide durable long-term benefits."

115.   The statements referenced in ¶¶73-80, 88-101, and 110-114 above were materially false and misleading because they failed to disclose material adverse facts about Agenus's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements which failed to disclose, *inter alia*, that: (1) the Company's botensilimab

and balstilimab combination therapy was not as effective as Defendants had led investors to believe; and (2) due to the foregoing, the botensilimab and balstilimab combination therapy's clinical results and regulatory and commercial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH EMERGES**

### *July 18, 2024 Press Release*

116.    The truth fully emerged on July 18, 2024 when, before the market opened, Agenus published a press release titled "Agenus Announces End-of-Phase-2 Meeting Outcomes and Topline Interim Phase 2 Data for BOT/BAL in MSS Colorectal Cancer." In relevant part, the press release stated:

> Agenus [. . .] today announced the results of its end-of-Phase 2 (EOP2) meeting with the U.S. Food and Drug Administration (FDA), for the advancement of its immunotherapy combination, botensilimab (BOT) and balstilimab (BAL), for the treatment of adult patients with relapsed/refractory microsatellite stable colorectal cancer (r/r MSS CRC) with no active liver metastases (NLM).
>
> Key Outcomes of the EOP2 Meeting:
>
> ☐ **Dosing Regimen**: Agenus gained agreement on the proposed BOT/BAL combination dosing regimen of 75mg BOT once every 6 weeks for up to 4 doses in combination with 240mg BAL once every 2 weeks for up to 2 years.
> ☐ **Randomized Phase 2 Interim Data**: Topline interim data suggest best activity seen at 75 mg BOT/240mg BAL combination (ORR 19.4%; 6- month survival rate of 90%; data continues to mature).
> ☐ **Accelerated Approval**: *FDA advised against submission of these results in support of an Accelerated Approval based on their view that objective response rates may not translate to survival benefit*.
> ☐ **Phase 3 Protocol Design**: The FDA recommended the inclusion of a BOT monotherapy arm at Agenus' discretion in the Phase 3 study.

117.    On this news, the Company's stock price fell $10.43 per share, or 58.83%, from a closing price of $17.73 on July 17, 2024 to close at a price of $7.30 per share on July 18, 2024.

## DAMAGES TO AGENUS

118.    As a direct and proximate result of the Individual Defendants' conduct, Agenus has lost and expended, and will continue to lose and expend, many millions of dollars.

119.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

120.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

121.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

122.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

123.    As a direct and proximate result of the Individual Defendants' conduct, Agenus has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

124.     Plaintiff brings this action derivatively and for the benefit of Agenus to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Agenus, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

125.     Agenus is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

126.     Plaintiff is, and has been at all relevant times, a shareholder of Agenus. Plaintiff will adequately and fairly represent the interests of Agenus in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

127.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

128.     A pre-suit demand on the Board of Agenus is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Armen, Corvese, Hirsch, and Wright (the "Director-Defendants") and non-parties Jennifer Buell and Thomas L. Harrison (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to three of the six Directors who are on the Board at the time this action is commenced.

129.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

130.    As Board members of Agenus charged with overseeing the Company's affairs, all of the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Agenus, the Director-Defendants must have been aware of the material facts regarding the issues related to Agenus's combination therapy of botensilimab and balstilimab. Moreover, Defendants Armen, Corvese, and Wright have extensive experience in the pharmaceutical industry, meaning they had even more reason to be aware that there were issues with the Company's combination therapy. For example, the 2024 Proxy Statement stated that: (1) Defendant Armen has "years of expertise in the financial and biopharmaceutical areas," having served on the Board of Directors of three other bipopharmaceutical companies; (2) Defendant Corvese "currently serves on the Board of Directors of MiNK Therapeutics, Inc., the National Telecommunications Corporation, based in Cairo, Egypt, and Protagenic Therapeutics, an affiliate of Agenus, based in Ontario, Canada"; and (3) Defendant Wright "brings to our Board over 30 years of global pharmaceutical industry experience in general management, product development, and commercialization as well as business restructuring and transaction experience." For these reasons, too, demand on the Director-Defendants is futile.

131.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Agenus to issue materially false and misleading statements. Specifically, the Director-Defendants caused Agenus to issue false and misleading statements which were intended to make Agenus appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

132.    Pursuant to the 2024 Proxy Statement, the Director-Defendants solicited shareholders to approve the amendments to the Plan to increase the number of shares they could receive for their own benefit. These financial incentives precluded the Director-Defendants from acting in the best interests of the shareholders, as they could not simultaneously request approval of the amended Plan while also failing to provide shareholders with information in the 2024 Proxy Statement regarding the true state of the Company. Their solicitation, which they materially benefitted from, and the approval of the proposals were based on materially false and misleading statements and omissions. The Director-Defendants are thus conflicted from considering a demand against them based on these circumstances as well.

133.    Additional reasons that demand on Defendant Armen is futile follow. Defendant Armen co-founded Agenus in 1994 and has served as the Company's CEO and Chairman since its founding and as a Company director since 1999. Defendant Armen previously served as the Company's President from its founding until December 2019. He also serves as a member of the Executive Committee. As such, the Company provides Defendant Armen with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As CEO and a director throughout the Relevant Period, Defendant

Armen was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including those statements which he personally made. In addition, he solicited the 2023 and 2024 Proxy Statements which contained false and misleading elements and resulted in, *inter alia*, shareholders voting to: (1) re-elect several of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Agenus; and (2) approve the proposed amendment to the Plan, thereby increasing the number of shares available for issuance thereunder by 3,000,000 shares. He also signed the false and misleading 2022 and 2023 10-Ks as well as accompanying SOX certifications attesting to their accuracy. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Armen is a defendant in the Securities Class Action. For these reasons, too, Defendant Armen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.     Additional reasons that demand on Defendant Corvese is futile follow. Defendant Corvese has served as a Company director since 2007 and also serves as Chair of the Executive Committee and as a member of the Compensation Committee and the Corporate Governance and Nominating Committee. Defendant Corvese has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In

addition, he solicited the 2023 and 2024 Proxy Statements which contained false and misleading elements and resulted in, *inter alia*, shareholders voting to: (1) re-elect several of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Agenus; and (2) approve the proposed amendment to the Plan, thereby increasing the number of shares available for issuance thereunder by 3,000,000 shares. He also signed the false and misleading 2022 and 2023 10-Ks. For these reasons, Defendant Corvese breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Hirsch is futile follow. Defendant Hirsch has served as a Company director since October 2020 and also serves as a member of the Audit Committee. Defendant Hirsch has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, she solicited the 2023 and 2024 Proxy Statements which contained false and misleading elements and resulted in, *inter alia*, shareholders voting to: (1) re-elect several of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Agenus; and (2) approve the proposed amendment to the Plan, thereby increasing the number of shares available for issuance thereunder by 3,000,000 shares. She also signed the false and misleading 2022 and 2023 10-Ks. For these reasons, Defendant Hirsch breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

136.     Additional reasons that demand on Defendant Wright is futile follow. Defendant Wright has served as a Company director since 2006 and also serves as Chair of Corporate Governance and Nominating Committee and as a member of the Executive Committee, Compensation Committee, and Audit Committee. Defendant Wright has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he solicited the 2023 and 2024 Proxy Statements which contained false and misleading elements and resulted in, *inter alia*, shareholders voting to: (1) re-elect several of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to Agenus; and (2) approve the proposed amendment to the Plan, thereby increasing the number of shares available for issuance thereunder by 3,000,000 shares. He also signed the false and misleading 2022 and 2023 10-Ks. For these reasons, Defendant Wright breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.     Additional reasons that demand on the Board is futile follow.

138.     Defendants Hirsch and Wright (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the

public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

139.    All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

140.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

141.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

142.    The acts complained of herein constitute violations of fiduciary duties owed by Agenus's officers and directors, and these acts are incapable of ratification.

143.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Agenus. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Agenus, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

144.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Agenus to sue the Individual Defendants named herein, since, if they

did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

145.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

146.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

148.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

149.    Under the direction and watch of Defendants Armen, Hirsch, Wiinberg, Corvese, Wright, and Jeynes-Ellis, the 2023 and 2024 Proxy Statements failed to disclose, *inter alia*, that:

(1) the Company's botensilimab and balstilimab combination therapy was not as effective as Defendants had led investors to believe; and (2) due to the foregoing, the botensilimab and balstilimab combination therapy's clinical results and regulatory and commercial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

150.     The 2023 and 2024 Proxy Statements also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 and 2024 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

151.     In the exercise of reasonable care, Defendants Armen, Hirsch, Wiinberg, Corvese, Wright, and Jeynes-Ellis knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement including, but not limited to, the re-election of Defendants Armen, Hirsch, and Wiinberg to the Board.

152.     In the exercise of reasonable care, Defendants Armen, Hirsch, Wiinberg, Corvese, Wright, and Jeynes-Ellis knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement including, but not

limited to, the re-election of Defendant Hirsch to the Board and the approval of the amendment to the Plan, thereby increasing the number of shares available for issuance thereunder by 3,000,000 shares.

153.     As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted, *inter alia*, to re-elect Defendants Armen, Hirsch, and Wiinberg to the Board, thereby allowing them to continue breaching their fiduciary duties to Agenus.

154.     As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) re-elect Defendant Hirsch to the Board, thereby allowing her to continue breaching her fiduciary duties to Agenus; and (2) approve the proposed amendment to the Plan, thereby increasing the number of shares available for issuance thereunder by 3,000,000 shares.

155.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

156.     Plaintiff, on behalf of Agenus, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

157.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Agenus's business and affairs.

159.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

160.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Agenus.

161.    In breach of their fiduciary duties owed to Agenus, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's botensilimab and balstilimab combination therapy was not as effective as Defendants had led investors to believe; and (2) due to the foregoing, the botensilimab and balstilimab combination therapy's clinical results and regulatory and commercial prospects were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

162.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

163.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

164.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were

available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Agenus's securities.

165.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Agenus's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

166.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

167.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Agenus has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

168.    Plaintiff, on behalf of Agenus, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Agenus.

171.     The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Agenus that was tied to the performance or artificially inflated valuation of Agenus, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

172.     Plaintiff, as a shareholder and a representative of Agenus, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

173.     Plaintiff, on behalf of Agenus, has no adequate remedy at law.

## FOURTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

174.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Agenus to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

176.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

177.    Plaintiff, on behalf of Agenus, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

178.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

179.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Agenus in a manner consistent with the operations of a publicly held corporation.

180.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Agenus has sustained and will continue to sustain significant damages.

181.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

182.    Plaintiff, on behalf of Agenus, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

183.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Agenus, for which they are legally responsible.

185.    As a direct and proximate result of the Individual Defendants' abuse of control, Agenus has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiff, on behalf of Agenus, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against Defendants Armen, Klaskin, and O'Day for Contribution Under Sections 10(b) and 21D of the Exchange Act**

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.    Agenus and Defendants Armen, Klaskin, and O'Day are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Armen's, Klaskin's, and O'Day's willful and/or reckless violations of their obligations as officers and/or directors of Agenus.

189.    Defendants Armen, Klaskin, and O'Day, because of their positions of control and authority as officers and/or directors of Agenus, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Agenus, including the wrongful acts complained of herein and in the Securities Class Action.

190.    Accordingly, Defendants Armen, Klaskin, and O'Day are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

191.    As such, Agenus is entitled to receive all appropriate contribution or indemnification from Defendants Armen, Klaskin, and O'Day.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Agenus, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Agenus;

(c)    Determining and awarding to Agenus the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Agenus and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Agenus and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Agenus to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations;

(e)     Awarding Agenus restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 12, 2024

**THE BROWN LAW FIRM, P.C.**

*/s/ John Coyle IV*
John Coyle IV (BBO #714121)
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: jcoyle@thebrownlawfirm.net
    tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Chelsea Royse, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 12__ day of November, 2024.

Signed by:

*Chelsea Royse*
487A662E05D2488

Chelsea Royse